# PURCHASE AGREEMENT

THIS PURCHASE AGREEMENT ("Agreement") is made effective as of May 18, 2006 by and between **Xcel Energy Services Inc.** ("Seller"), 414 Nicollet Mall Minneapolis, MN 55401, acting as purchasing agent for Northern States Power Company (Minnesota); Northern States Power Company (Wisconsin); Public Service Company of Colorado; and Southwestern Public Service Company, and **Asset Acceptance LLC,** a Delaware Limited Liability Company, whose address is 28405 Van Dyke Ave Warren, MI 48093 ("Purchaser").

WITNESSETH

WHEREAS, Seller has charged-off accounts which are delinquent, but the outstanding balance of which remains the obligation of the defaulting customer;

WHEREAS, Seller desires to sell certain of its charged-off accounts to Purchaser, and

WHEREAS, Purchaser desires to purchase such charged-off accounts, all on the terms and conditions hereinafter set forth.

NOW THEREFORE, in consideration of the foregoing recitals and the mutual covenants and agreements of the parties hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. Definitions

As used herein, the following terms have the following respective meanings:

"Account(s)" means an account established for a customer of Seller for which there is an unpaid balance of all amounts due from the applicable customer.

"Customer" means the person or entity who or which is obligated to repay an Account to Seller, or if there are multiple persons or entities obligated to repay an Account, all such persons or entities collectively.

"Charged-off Account" means an Account which Seller has charged-off its books as uncollectible in accordance with usual and customary accounting practices and applicable Federal Regulations, if any.

31 DE

"Closing Date" means May ~~18~~, 2006 or such date as may be agreed upon by Seller and Purchaser for the purchase and sale of Charged-off Accounts under Section 2 of this Agreement.

"Ineligible Account" means any Account which has become uncollectible, prior to the Closing Date, because: (i) the customer voluntarily or involuntarily becomes subject to bankruptcy proceedings before the Closing Date; (ii) Account is determined to have been opened or used fraudulently or; (iii) the customer was deceased prior to Closing Date; (iv) the Account has been paid or settled in full prior to the Closing Date or; (v) any other reason which makes the Account legally uncollectible, provided that such circumstances occurred prior to the Closing Date hereunder including, but not limited to, mentally incapacitated debtors (as indicated by collection notes provided by Seller), and incarcerations.

"Purchased Accounts" has the meaning set forth in Section 2(a).

"Unpaid Balance" means, as to any Account at the time of charge-off the total outstanding unpaid balance, less payments, as shown on Seller's books and records. The Unpaid Balance



EXHIBIT A

does not include post-charge-off fees or interest. The Unpaid Balance is due and owing in U.S. Dollars.

2. Sale of Accounts

(a) Subject to the terms and conditions of this Agreement, on the Closing Date Seller will sell, assign and transfer to Purchaser all of its rights, title and interest in and to the [redacted] Charged-off Accounts (which Charged-off Accounts have previously been provided to Purchaser on a printout or CD and are incorporated herein as Exhibit A) which, on the Closing Date, have an aggregate Unpaid Balance of no less than [redacted] Dollars ($[redacted]. The accounts transferred are collectively referred to as the "Purchased Accounts."

(b) In consideration for the sale by Seller to Purchaser of the Purchased Accounts as provided in Section 2(a), Purchaser agrees to pay Seller the following (collectively, the "Purchase Price"): $[redacted] which is approximately [redacted]% of the Unpaid Balance due on the Closing Date.

(c) Upon receipt of the Purchase Price, Seller will sign the Assignment, attached hereto as Exhibit C and immediately provide it to Purchaser via facsimile and U.S. Mail.

(d) Within 1 business day following the Closing Date, Seller will supply Purchaser with a copy of the Assignment in the form attached hereto as Exhibit C.

3. Seller's Assistance with Follow-up Inquiries; Selected Seller's Practices

Purchaser agrees not to refer any customer of Seller whose account is the subject of this Agreement to Seller, but Purchaser will handle any such customer inquiries directly with Seller. Seller agrees to reasonably assist Purchaser if Purchaser needs Seller to investigate any of the Customer's claims which Purchaser deems should be investigated.

Seller has not included any accounts coded as "unauthorized usage".

Seller typically charges an account off 45 days after an account has been not paid.

Seller has not added any post charge off interest or fees to the balances.

4. Reimbursement of Accounts

Seller shall use its reasonable efforts to determine whether the Purchased Accounts include any Ineligible Accounts. If, within 90 days following the Closing Date, it is mutually agreed that Ineligible Account(s) were included in the Purchased Accounts, then the Seller agrees to reimburse the Purchaser in an amount equal to Purchaser's payment on the Ineligible Account in question within 30 days of Purchaser's written notice thereof, with either cash or additional accounts acceptable to Purchaser. Purchaser must provide Seller with reasonable documentation evidencing ineligibility that comes to Purchaser within the 90 days following the Closing Date. Reasonable documentation of Ineligible Accounts will include but not be limited to, electronic Banko® information, death certificates, credit bureau documentation indicating death or bankruptcy, settlement/paid in full letters, verbal confirmation from Seller, or an affidavit of fraud. In such event, Purchaser will execute such documents as Seller may request in order to document the re-assignment to Seller of the Ineligible Accounts.

5. Purchaser's Representations and Warranties

Purchaser hereby represents and warrants to Seller as of the date hereof:

(a) Due Organization, Authorization. Purchaser is duly organized, existing and is in good standing as a limited liability company under the laws of the State of Delaware. Purchaser has full authority to execute, deliver and perform this Agreement according to its terms, and Purchaser's execution, delivery and performance of this Agreement have been duly authorized and are not in conflict with any law or regulation applicable to Purchaser or the terms of Purchaser's company documents or articles of incorporation, charter or bylaws, as applicable, or of any indenture, agreement or undertaking to which Purchaser is a party or by which it or any of its accounts is bound.

(b) No Conflict. Purchaser's review of Account information will not represent a conflict of interest on the part of Purchaser or Purchaser's officers or employees, and neither Purchaser nor any of Purchaser's affiliated companies is presently a party to any litigation, or involved in any litigation, with any Customer or with Seller.

6. Seller's Representations and Warranties

Seller hereby represents and warrants to Purchaser as of the Closing Date:

(a) Ownership/Authority. Seller is the sole owner of all right, title and interest in and to the Accounts, free and clear of all liens and encumbrances (except for blanket UCC-1's filed by lenders to the Seller that cover Seller's consumer accounts receivable), and has the right to transfer Seller's interest therein to Purchaser on the terms and conditions set forth herein. Seller has all requisite power and authority to perform all obligations under this Agreement and to execute all instruments and other documents contemplated to be executed and delivered by Seller to Purchaser in connection herewith.

(b) Compliance with Laws. In the origination and servicing of the Accounts, Seller has complied in all material respects with federal and state laws, to the best of its knowledge.

(c) No Fees Owed. Seller warrants that all the Purchased Accounts have been recalled from any previous third party collection agency or attorney and that there are no monies, commissions or fees owed to any such third party collection agency or attorney.

7. Data & Due Diligence Information– Additional Representations & Warranties

Seller warrants that all data provided to Purchaser, including but not limited to, Unpaid Balance, Charge off Date, Last Payment Date, or Service Date, is true and accurate to the best of Seller's knowledge and that the integrity of the data has not been altered in any way to the best of Seller's knowledge.

(a) The answers provided by Seller on the Questions and Answers, attached hereto as Exhibit B, are true and accurate to the best of Seller's knowledge.

(b) All due diligence information given to Purchaser from Seller, both written and verbal, is true and accurate to the best of Seller's knowledge.

8. Left intentionally blank

9. Compliance with the Law

In the performance of its collection efforts, and in the course of collection of the Purchased Accounts, Purchaser agrees at all times to conform with all requirements of all applicable federal, state and local laws, rules and regulations applicable to the conduct of such

activities, including, without limitation, the requirements of the Fair Debt Collection Practices Act (15 USC SS 1692 et seq.), the Fair Credit Reporting Act (15 U.S.C. §§ 1581-1581(u)), and the Gramm-Leach-Bliley Act (15 U.S.C. §§ 6801 – 6809), and regulations promulgated thereunder.

10. Purchaser's Indemnification

Purchaser shall defend, indemnify and hold Seller (including its officers, trustees, directors, employees, stockholders, and agents) harmless from and against any claims, actions, suits or other actual or threatened proceedings, and all losses, judgments, damages, expenses or other costs (including reasonable fees and disbursements of counsel) incurred or suffered by Seller by reason of Purchaser's wrongful acts or omissions, Purchaser's breach of this Agreement, Purchaser's willful misconduct, or any violation of applicable law, rule or regulation by Purchaser (or its employees or agents) in connection with the collection or enforcement of the Purchased Accounts or other performance of Purchaser's obligations under this Agreement after the Closing Date.

11. Seller's Indemnification

Seller shall defend, indemnify and hold Purchaser (including its officers, trustees, directors, employees, stockholders, and agents) harmless from and against any claims, actions, suits, or other actual or threatened proceedings, and all losses, judgments, damages, expenses or other costs (including reasonable fees and disbursements of counsel) incurred or suffered by Purchaser by reason of willful misconduct or violation of any applicable law, rule or regulation by Seller (or its employees or agents) in connection with the collection or enforcement of the Purchased Accounts prior to Closing Date.

12. Relationship

Nothing in this Agreement is intended to or shall be construed to constitute or establish an agency, joint venture, partnership or fiduciary relations between the parties and no party shall have the right or authority to act for or on behalf of the other with respect to any matter.

13. Notices/Payments

Any and all payments or other communications received by Seller under this Agreement shall be in writing and shall be delivered to Purchaser by Federal Express or similar overnight carrier, and all communications by Purchaser to Seller under this Agreement shall be in writing and shall be delivered to Seller by Federal Express or similar overnight carrier, in each case addressed as follows:

Purchaser:
Asset Acceptance LLC
28405 Van Dyke Ave
Warren, MI 48093
Attn: Mark Hutchins, AVP Marketing and Acquisitions

Seller:

Xcel Energy Services Inc.
Supply Chain Management
Sourcing / Contracts Division
1123 West 3rd Avenue
Denver, CO 80223
Attn: Steve Yobst, Sourcing Strategist, CPA



EXHIBIT A

or to such address as either party shall have previously designated to the other party by written notice sent Federal Express or similar carrier for delivery next business morning. Purchaser is entitled to any payments received on the Purchased Accounts on or after the Closing Date. Seller will immediately mail to the above Purchaser's address any payments received by Seller.

14. Records/Documentation

For 180 days following the Closing Date and upon request from Purchaser, Seller will provide copies of screen prints, statements or other validation of debt from Seller's existing records relating to the Purchased Accounts. After 180 days from the Closing Date has elapsed, Purchaser will pay Seller $5.00 per copy for any Purchased Account for which documentation is requested by Purchaser. After 365 days following the Closing Date have elapsed, Purchaser shall pay $7.50 per copy for any screen print, statement or other validation of debt. In the case that proper validation from time to time cannot be produced, Seller shall provide Purchaser with an Affidavit .

15. Credit Bureau Reporting

If Seller is currently reporting to the credit bureaus, Seller agrees to update its trade line on the credit bureaus and notate all reported accounts under this Agreement as sold to Purchaser. Purchaser will not update or use Seller's credit bureau trade line. Seller will also direct all incoming calls received in regard to the Accounts to Purchaser immediately.

16. Entire Agreement/Amendment

This Agreement, including Exhibits A, B, C, & D, constitutes the entire understanding between the parties with respect to the subject matter and supersedes all prior written and oral proposals, understandings, agreements and representations, all of which are merged herein. No amendment of this Agreement shall be effective unless in writing and executed by each of the parties hereto.

17. Assignment

Purchaser and Seller may assign this Agreement to any successor or affiliate surviving corporation in any merger, reorganization or the like upon the condition that the assignee shall assume, either expressly or by operation of law, Seller's or Purchaser's obligations hereunder; and provided, further, that Purchaser may assign, upon written notice from Seller, which shall not be unreasonably withheld, as security its rights in the Purchased Accounts and its rights under this Agreement to the financial institution (and its successors or assigns) which is providing financing to Purchaser for the Purchase Price hereunder.

18. Closing

The closing on the purchase and sale of the Purchased Accounts under Section 2 hereof shall occur on the Closing Date. The Closing Date shall take place in the offices of Seller located at the address specified in Section 13 hereof, or at such other place as shall be mutually agreed to between the parties. The parties agree that the execution of any closing documents may take place in counterparts.

19. Governing Law

This Agreement shall be governed by, and any disputes or interpretation construed and enforced in accordance with, the laws of the State of Minnesota.

20. Confidentiality



EXHIBIT A

Seller will keep confidential and will not, without Purchaser's written consent, which will not be unreasonably withheld, divulge, disclose or disseminate information pertaining to this transaction except to those persons, entities, regulators or agencies which have a bona fide need or legal right to receive such information.

Purchaser will keep confidential and will not, without Seller's written consent, which will not be unreasonably withheld, divulge, disclose, disseminate information pertaining to this transaction except to those persons, entities, regulators or agencies which have a bona fide need or legal right to receive such information.

IN WITNESS WHEREOF, the parties have duly executed this Agreement as of the day and year first above written.

SELLER
Xcel Energy Services Inc. acting as purchasing agent for Northern States Power Company (Minnesota); Northern States Power Company (Wisconsin); Public Service Company of Colorado; and Southwestern Public Service Company

By: Benjamin G. Fowke III, Chief Financial Officer

PURCHASER
Asset Acceptance, LLC

By: Deborah Everly, VP Marketing & Acquisitions



EXHIBIT A

**EXHIBIT A –**

**SEE ELECTRONIC CD FOR DETAILS**

**# OF ACCOUNTS:** [redacted]
**$ OF ACCOUNTS:** $[redacted]

## EXHIBIT B – SELLER QUESTIONNAIRE

**Respondent "A"**

Q1: Could Xcel share the agency batch tracks for the accounts within the portfolio so we have a better understanding of the collection history?
A1: No.

Q2: Can Xcel provide the monthly cash flow for the past 6 months that has been received on the accounts from this portfolio?
A2: Account payment history will be provided with the final data file, to the extent available in our new billing system.

**Respondent "B"**

Q1: What does the negative balance represent?
A1: Write-Off reversals.

Q2: Have you ever sold charged-off accounts before?
A2: No.

Q3: Is Monday's bid an indicative bid or final?
A3: Final.

Q4: What will be included in the final sale file?
A4: TBD. See detail data file for fields known to be available.

Q5: If we are the high bid can we perform an on-site due diligence?
A5: Yes.

Q6: Have these accounts been scrubbed for BK, Deceased?
A6: Yes. No.

Q7: What is the charge-off policy that applies to these accounts?
A7: Nonpayment 181 days or longer.

Q8: Have all accounts that have been out to agencies/attorneys been recalled?
A8: All placed accounts will have been recalled prior to sale.

Q9: When was the last time that these accounts were at an agency/attorney for collection?
A9: Some are still with agencies, but will be recalled prior to sale.

Q10: What were your agency/attorneys average recovery rates, gross, on a 12 month period – by placement level?
A10: N/A.

Q11: What settlement offers has been made to these accounts?
A11: N/A.

Q12: How long were these accounts at the agencies / attorneys at each placement level?
A12: N/A.

Q13: What kind of legal efforts do you use? What are your suit guideline requirements?



EXHIBIT A

A13: N/A.

Q14: Have these accounts been scored since charge-off?
A14: No.

A15: What kind of selection process were these accounts put through to determine what to sell?
Q15: Write-Offs from 2004 and earlier.

A16: Which credit bureaus are these accounts reported to?
Q16: N/A.

Q17: Once sold, how will you be reporting these to the credit bureau?
A17: N/A.

Q18: Are there any commercial accounts included? How many?
A18: Yes. See detail file (customer type).

A19: Do these accounts include post charge-off interest?
Q19: No.

A20: What interest rate was charged on these accounts prior to charge-off?
Q20: N/A.

Q21: How delinquent did the customer become before they could not use services/account provided?
A21: Varies by state.

Q22: Please describe the way that your documentation is kept and the process you have to go through
A22: automated billing/CIS database.

Q23: Are you aware of any past statute accounts? If yes, will they be repurchased?
A23: No.

A24: Are you aware of any disputed accounts in this portfolio?
Q24: No.

Q25: Are you aware of any accounts which have retained attorneys included in this portfolio?
A25: No.

Q26: Have these accounts been a party to litigation against the original creditor via Class Action
A26: No.

Q27: Is there anything in your card member agreement or contract that requires arbitration rather than. litigation
A27: N/A.

Q28: Has the original lender been fined, scrutinized or sanctioned by the FTC or any other state or Federal agency regarding its collection practices or underwriting guidelines?
A28: No.

Q29: Have any of the accounts that you are selling received a 1099-c?
A29: No.

Q30: What price are you looking at for these accounts?
A30: HIGH.



EXHIBIT A

Q31: Is the re-sale of accounts permitted?
A31: Yes, with written approval from Xcel Energy.

**Respondent "C"**

Q1: When you get a moment could you please describe your charge-off policy? It is an answer we are looking for due to the uniqueness of the debt in your industry.
A1: Nonpayment 181 days or longer.

**Respondent "D"**

Q1: Can you provide the full list of fields that will be available to the Purchaser and the % availability for each?
A1: See detail file.

Q2: Does the Month and Year in the Summary Debt spreadsheet refer to the charge-off date, disconnect date, open date, or another date?
A2: See detail file.

Q3: Can a State Breakdown be provided?
A3: Yes. Included in detail file.

Q4: Are the companies in the Summary Debt spreadsheet the actual service providers (operating companies)?
A4: Yes.

Q5: Can the definitions of the abbreviated companies in the Summary Debt spreadsheet be provided?
A5: Yes.

Q6: Who was the originator of these accounts?
A6: See company field in detail file.

Q7: By what name will the debtor recognize the account?
A7: Name and premise address.

Q8: How were the accounts originated? (E.g. direct mail, internet, telemarketing, etc.)
A8: N/A.

Q9: What specific guidelines did the debtor have to meet to qualify for the account?
A9: State PUC regulations.

Q10: Is there any business accounts included? If so, are they personally guaranteed?
A10: Yes. No.

Q11: What is the charge-off policy? (E.g. 180 days past due, 90 days past due for first payment default)
A11: Nonpayment 181 days or longer.

Q12: Do the balances contain fees/interest since charge off?
A12: No.

Q13: What entities have had title to these accounts? (Provide a list including the date of each transaction.)
A13: N/A.

Q14: Upon purchase, will copies of each previous bill of sale be provided (if applicable)?
A14: N/A.

Q15: What criteria were used in selecting this pool?
A15: Write-Offs from 2004 and earlier

Q16: What are the specific reasons accounts would have been excluded from this sale file? (E.g. high recovery score, paid within 90 days, balance < $100, placed with an agency, etc.)
A16: Bankruptcy.

Q17: Are these accounts reported credit bureaus? Which ones?
A17: N/A.

Q18: Is the Date of First Delinquency available for each account?
A18: No.

Q19: How will the accounts be reported after they are sold?
A19: N/A.

Q20: What were the Pre-Charge Off collection efforts?
A20: See account collection activities in detail file.

Q21: What were the Post-Charge Off collection efforts?
A21: N/A.

Q22: How many different agencies, including internal collections, have collected these accounts?
A22: See detail file.

Q23: Which agencies?
A23: See detail file.

Q24: If applicable, what factors are considered in evaluating accounts for possible legal action?
A24: N/A.

Q25: Are there any accounts in the sale file still placed with agencies or attorneys? If so, will they be recalled prior to sale?
A25: All placed accounts will be recalled prior to sale.

Q26: What was the settlement authority of the collectors?
A26: N/A.

Q27: Have any settlement offers been mailed? Can the date and terms of the most recent offer be provided for each account?
A27: No.

Q28: Can a flag for bad addresses be provided?
A28: No.

Q29: When were the accounts with bad addresses most recently skip-traced?
A29: N/A.

Q30: When were the accounts most recently scrubbed for bankruptcy and deceased?
A30: Bankruptcies were purged on March 17, 2006. No action on possible deceased status has been taken.



EXHIBIT A

Q31: Have the accounts been solicited for a credit card balance transfer? If so, can the date of the most recent offer be provided for each account?
A31: N/A.

Q32: Does your company, or the previous owner, issue 1099c's for any accounts that are or were previously owned by you?
A32: No.

Q33: Are general Terms & Conditions available? Can copies be provided prior to sale?
A33: No.

Q34: Upon sale, can an electronic file of payment history for each account be provided?
A34: Yes.

Q35: What specific types of documents can be supplied?
A35: Detailed data file only.

Q36: Will it be supplied at closing or upon request? If upon request, will there be a cost to us for retrieving documents? How much? What is the anticipated turnaround time? Is there a point in time when documents can no longer be requested?
A36: N/A.

Q37: Do you have a process for identifying payments you receive on sold accounts?
A37: Yes. Post sale payments will be documented and payment made to new owner for a mutally agreed upon period of time.

Q38: How often are such payments remitted to the buyer? (E.g. weekly, monthly)
A38: N/A.

Q39: When remitting direct payments, do you aggregate them and cut a check to the buyer or do you forward the payments?
A39: The former.

Q40: Time Frame or Cost?
A40: No cost. See above re time frame.

Q41: Is re-sale permitted? Are there any stipulations to re-sell?
A41: Yes. No.

Q42: What are the price expectations for this file?
A42: N/A.

Q43: What accounts are eligible for repurchase/put-backs?
A43: All.

Q44: Can you provide account level detail for the accounts that are reserved for sale so we can evaluate the quality and availability of the data? If this is not possible, then can a sample file be provided?
A44: See detail file.

Q45: Can you verify that the RFP deadline is Monday, March 20, 2006 by 5pm Mountain Time? Is this a strict deadline or will extensions be available?
A45: Deadline will be extended. All times are Mountain Time.



EXHIBIT A

**Respondent "E"**

**Required Fields**

Q1: Account caption
A1: Account Number

Q2: Social security number
A2: The majority of accounts have SSN.

Q3: Service address
A3: Yes.

Q4: Date service initiated
A4: No.

Q5: Date of final bill
A5: Yes.

Q6: Final bill amount
A6: Yes.

Q7: Charge off date
A7: Yes.

Q8: Mailing address (if available)
A8: Yes – as available.

Q9: Amount of last payment (if available)
A9: Yes.

Q10: Date of last payment (if available)
A10: Yes.

Q11: Account Number
A11: Yes.

Q12: Date of first delinquency
A12: No.

**Respondent "F"**

Q1: What types of accounts are these (credit card, consumer loans, auto deficiencies, etc.)?
A1: Utility customers

Q2: Regarding the subject file, please complete all applicable agency status categories and their liquidation rates as performed by originator/debt issuer.

| | Current Balance | Liquidation Rate % |
|---|---|---|
| [ ] Internal collection effort only | ____________ | ____________ |
| [ ] Primary recalls | ____________ | ____________ |
| [ ] Secondary recalls | ____________ | ____________ |



EXHIBIT A

[ ] Tertiary or beyond ______________ ______________
[ ] Complete life cycle ______________ ______________

A2: See detail file.

Q3: Was your institution the original issuer for the accounts? If not, when did you acquire the remaining accounts and from whom?
A3: Yes.

Q4: What was the charge-off policy governing these accounts?
A4: Nonpayment 181 days or longer.

Q5: What was the interest charged (%) on the accounts prior to charge-off?
A5: N/A.

Q6: Is delinquency based on "recency" or "contractual" number of days?
A6: "recency".

Q7: Describe cancellation and return policies for each collection agency. Were agencies given settlement guidelines? If so, please describe.
A7: N/A.

Q8: What was the last recall date by originator? By seller?
A8: N/A.

Q9: Any activity post recall? If so, what:
A9: See detail file.

Q10: Can you supply any cash flow history post charge-off?
A10: Yes, to the extent available within our new billing system.

Q11: In identifying the accounts for sale, what criteria were assigned to generate the pool (ie. low behavior score, liquidation rate, etc.)?
A11: Write-Offs from 2004 and earlier.

Q12: If any, what kind of credit scoring system do you use?
A12: Proprietary.

Q13: Are you willing to repurchase or replace accounts sold that, prior to closing date, were documented bankrupt, fraud, deceased or otherwise legally uncollectible? Do you have the capability of identifying these accounts prior to the sale date?
A13: Yes. No, with the exception of bankruptcies which have already been purged.

Q14: Are you willing to repurchase or replace accounts which are aged beyond the statute of limitations?
A14: Yes.

Q15: Do the data fields include the name of collection agency(s) previously assigned the file(s)? If no, please list a few who may have worked portions of the file prior to its sale.
A15: No.

Q16: Since charge-off, have interest and late fees been accrued to the accounts? Are these amounts included in the sale price?
A16: No.

Q17: What is the policy of the Seller in reporting these accounts to credit reporting agencies?
A17: Varies by state – PUC regulations.



EXHIBIT A

Q18: Are you willing to report accounts "sold" or "transferred" to the credit agencies?
A18: No sold accounts are included. All placed accounts will be recalled and documented.

Q19: Our bidding pool expects supporting documentation to be accessible as governed by the Purchase and Sale Contract. Describe what type of, and approximate percentages of each that are available to the file. Estimate the time frame(s) needed to retrieve and the desired duration of servicing such documentation:

| | | | |
|---|---|---|---|
| ______ | Written applications | ______ | Charge slips |
| ______ | Other applications | ______ | Correspondence |
| ______ | Statement of account | ______ | Loan agreement |
| ______ | Payment histories | ______ | Other (please explain) |

A19: See detail file.

Q20: Should bidder identify the percentage of data fields that are missing information (ie. social security numbers or home phone numbers, etc.)? Are these categories retrievable? What percentages of the following fields do you believe are available?

| Category | Est. % | Category | Est. % |
|---|---|---|---|
| Social Security number | ______ | Employer phone | ______ |
| Home phone | ______ | Charge-off amount | ______ |
| Last pay amount | ______ | Original account number | ______ |
| Last pay date | ______ | | |

A20: Employer phone not included. 33% of non-placed accounts do not have SSN; 17% of placed accounts do not have SSN.

Q21: Are you agreeable to marketing the portfolio in geographic regions and/or individual states?
A21: Yes.

Q22: Is resale permitted?
A22: Yes, with written approval from Xcel Energy.

Q23: Please provide originator collection history regarding:

Settlement offers prior to sale
Agency level, time at each agency
Settlement guidelines by agency level

A23: N/A.

Q24: Please provide reseller collection activity regarding:

Settlement offers
Collection practice (telemarketing, mailers, etc.)
How long have accounts been worked?
What fees have been added since original sale by originator?

A24: N/A.

Q25: Please provide the following information:

Ownership history of accounts
Copy of purchase and sale contract between sellers and buyers

A25: None of these accounts has been sold previously.

**Respondent "G"**

Q1: What types of accounts are these (credit card, consumer loans, auto deficiencies)

A1: Utility customers.



EXHIBIT A

**EXHIBIT C**

ASSIGNMENT

KNOWN ALL MEN BY THESE PRESENTS, that the undersigned Xcel Energy Services Inc.("Assignor"), acting as purchasing agent for Northern States Power Company (Minnesota); Northern States Power Company (Wisconsin); Public Service Company of Colorado; Southwestern Public Service Company, for and in consideration of the same of One Dollar ($1.00) and other good and valuable consideration, the receipt of which is hereby acknowledged, does by these presents, assign, sell, transfer, convey, and set over to Asset Acceptance LLC its successors and assigns, hereinafter referred to as "Assignee", all of its rights, title and interest in and to certain receivables, related documents evidencing security interest, liens or other security instruments or encumbrances executed, filed and/or created in conjunction with said Accounts and all other rights and documentation ancillary to said Accounts. Such Accounts are described in the attached Exhibit A and are referred to as Accounts in the Purchase Agreement ("Agreement") executed by the parties hereto effective as of May ~~18~~ 31 DE, 2006 which Agreement is incorporated herein and made a part hereof as if fully set forth.

This Assignment is made without recourse or warranty except as otherwise provided in that referenced Agreement effective as of May ~~18~~ 31 DE, 2006 executed by Assignor and Assignee and concerning the Accounts and other rights, privileges and documentation referred to herein and all its terms and conditions are incorporated herein and made a part hereof as if fully set forth.

Assignor:
Xcel Energy Services Inc.

By [signature]
SIGNATURE

Its ________________

________________
DATE

**Assignee:**

**Asset Acceptance, LLC**

**By** [signature]

**Its** V.P. Marketing & Acquisitions

**Dated** 5/31/06



EXHIBIT A

**EXHIBIT D**

**AFFIDAVIT - PROOF OF CLAIM**

**NAME OF AFFIANT**, being duly sworn, deposes and says:

1. That **he/she** is the Custodian of the Records ______________________________. and makes this affidavit on its behalf.

**2.** That this Affidavit is made on information and belief of the affiant after thorough review of all records of **[NAME OF CUSTOMER]** pertinent to the Customer's account.

3. The Customer, **[NAME OF CUSTOMER]**, had services rendered by ____________________. **[DATE OF SERVICE]**. However, the last payment on the account was received on **[DATE]**. The account was not charged off by ______________________ until **[DATE]. I** have reviewed the records pertaining to the Customer's payment history and Account and the principal amount due is [amount in words] Dollars **[$AMOUNT]**.

4. Asset Acceptance LLC purchased this charged-off account from Xcel Energy Services Inc. on **[DATE]**.

______________________________
**NAME OF AFFIANT**, Records Custodian

SWORN TO and subscribed before me this _____ day of MONTH, 2006 by said **NAME OF AFFIANT**, who is personally known to me and who took an oath.

______________________________
My commission expires:



EXHIBIT A